FILED
2014 Mar-27  AM 10:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN  DIVISION

| | | |
|---|---|---|
| **ACME ROOFING AND SHEET METAL COMPANY, INC./ITS JOINT VENTURE,** | ] ] ] ] | |
| **Interpleader Plaintiff,** | ] ] | **CV-12-BE-1056-E** |
| **v.** | ] ] | |
| **AIR TEAM USA, INC. et. al.,** | ] ] | |
| **Defendants.** | ] ] ] | |

## MEMORANDUM OPINION

This interpleader matter, originating in a government contract to provide roofing in the aftermath of Hurricane Ike, is before the court on "Defendant, Grace Construction, LLC's Motion for Summary Judgment."  (Doc. 69).  Co-Defendants Bennett Lumber Company LLC and Reroof America Management Services, LLC filed response (Docs. 73 and 74, respectively) and Grace filed replies to Bennett Lumber (doc. 76) and Reroof (doc. 77).  Because the fact section of Bennett Lumber's response did not comply with Appendix II, the court ordered it to file a revised fact section (doc. 83) and Bennett Lumber did so (doc. 84). This matter has received thorough briefing.

For the reasons stated in this Memorandum Opinion, the court FINDS that Grace's motion for summary judgment is due to be DENIED.

## I. PROCEDURAL HISTORY

In the aftermath of Hurricane Ike in September of 2008, Interpleader Plaintiff Acme

1

Roofing and Sheet Metal Company, Inc./ITS Joint Venture ("Acme/ITS") entered into a contract

with the United States Corps of Engineers to provide temporary roofing to structures with

hurricane damage.  In turn, Acme/ITS entered into a contract with five sub-contractors, including

Defendant Grace.  During an auditing process, the Joint Venture learned that three different

parties contended that Grace owed them money for the performance of its contract with

Acme/ITS: Air Team USA, Inc.; Bennett Lumber, and KDV Roofing.  The Joint Venture filed

this interpleader action (doc. 1) to determine which of the Defendants were entitled to any or all

of the contract proceeds, depositing with the court $115,692.64 as the alleged unpaid balance on

the project.

The court discharged Defendant KDV Roofing LLC filed a "Motion for [Substitution] of Real Party in Interest"

(doc. 16), stating that it had assigned to Reroof America Management Services, LLC all present

and future accounts receivable, contract rights, and rights of payment of every kind.  The court

granted this motion, and substituted Reroof for KDV Roofing, as the real party in interest. (Doc.

19).  In its Answer to the Interpleader Complaint, Reroof filed a cross-claim against Grace,

claiming that its assignee, KDV, fully performed under a subcontract agreement but that Grace

has refused to pay the balance due of $215,994.97.  (Doc. 17).

The court discharged the Plaintiff on its unopposed motion.   (Docs. 80 & 82).

The claims remaining in this action are the claims of Bennett Lumber Co, Grace, and

Reroof to the interpled funds, as well as Reroof's cross-claim against Grace.

The only motion currently under submission is Grace's motion for summary judgment

(doc. 69).

### III. FACTS

As noted previously, on September 21, 2008, Acme/ITS entered into a contract with the U.S. Army Corps of Engineers to perform the "Blue Tarp Project" for hurricane relief, but the involvement of Acme/ITS in this project was brief.  On September 25, 2008, the U.S. Army Corps of Engineers gave Acme permission to proceed with the relief project.  To perform its government contract for roof repairs caused by Hurricane Ike, Acme/ITS hired Grace as a primary roofing subcontractor, signing a written subcontract on September 24, 2008.  A few days later, on September 27, 2008, Grace received its first right-of-entry to begin work on the project, and it performed work for Acme/ITS pursuant to the contract for approximately ten days.

However, the Corps of Engineers pulled Acme off the Hurricane Ike Blue Tarp Project in October 2008.  Acme/ITS did not issue any new "rights-of-entry" on the Project after October 13, 2008, and the last repair work Acme/ITS performed was on December 5, 2008.  After the Corps of Engineers canceled the contract of Acme/ITS, Roy Campbell d/b/a STM Consultants, LLC a/k/a All American Brothers ("Campbell") occupied the position of general contractor on the Blue Tarp Project.

Grace's Dealings with KDV

On September 14, 2008—ten days before Grace actually became a subcontractor for Acme/ITS but in anticipation of the hurricane-related roof work—Grace entered into a subcontract with KDV Roofing as a secondary contractor.  Under that written subcontract agreement, KDV was to receive 36 cents per square foot for post-hurricane roof tarp work that KDV performed under the Acme/ITS contract.  Paragraph 12 of the subcontract provides that the agreement will be governed by Florida law, stating "This agreement shall be governed by Florida

3

law, without regard to its conflict of laws principles." (Doc. 75-2, at 4). That contract contains the signatures of Rafael Pereyra for KDV Roofing, as its owner, and Steven Rutherford for Grace, as its managing partner.

KDV also entered into a second contract on the same Blue Tarp Project with Roy Campbell d/b/a STM Consultants a/k/a All American Brothers, but KDV contends that the only work it performed and payments it received that pertain to this action are work it performed under the Acme/Grace contract and payments it received under that contract. According to Rafael Pereyra, the sole member of KDV, by November 7, 2008, KDV had completed the Hurrican Ike Blue Tarp Project work in Texas pursuant to that contract with Grace, and Pereyra had returned home to South Florida.

Although Grace originally had no direct contractual relationship with Defendant Reroof, Pereyra, individually and on behalf of KDV, executed a Management Agreement with Reroof executed on September 23, 2008, providing that Reroof would supply to KDV management support, including supplying employee payroll, for a fee. On September 22, 2008, Pereyra also signed, individually and on behalf of KDV, a Security Agreement through which Reroof would provide financial support to KDV. The Hurricane Ike Blue Tarp Project was only one of two projects in which KDV and Reroof worked together, the other project involving work associated with Hurricane Gustav.

Grace issued two checks for work KDV performed under the Acme/ITS contract. On November 5, 2008, Grace issued a check to KDV in the amount of $26,982.39, and on November 25, 2008, Grace issued another check to KDV in the amount of $39,833.53, for a total payment on the Acme/ITS contract of $66,815.92.

Although Grace issued other checks for the Blue Tarp Project to KDV and/or Pereyra, at least some of the evidence reflects that these payments were not for work performed under the Acme/ITS project.  On November 5, 2008, Grace issued a $10,000.00 check to Pereyra individually with a notation "loan against Blue Roof." (Greeson Dep., Ex. 8).  KDV/Reroof denies that this check constitutes payment to KDV for the Acme/ITS contract, and David Greeson, a Grace employee, stated that he was uncertain which contract this payment involved. A couple of weeks later, on November 18, 2008, Grace issued a check to KDV for $21,198.00 for work performed under the Campbell contract.

On December 14, 2008, Pereyra executed a document entitled "Partial Release of Lien," acknowledging the $88,013.92 paid to KDV on the two contracts for the Blue Tarp Project: $66,815.92 paid on the Acme/ITS contract and $21,198.00 paid on the Campbell contract.  This Partial Lien Waiver document reads in relevant part as follows:

> The undersigned has been employed by **Grace Construction, LLC** to furnish labor from KDV ROOFING for the improvement of the premises described as **Operation Blue Roof** for Hurricane Ike, County of **Beaumont and Galveston,** State of **Texas.**

> The undersigned, for and in consideration of the **Sum of $88,013.92** [] [l]awful money of the United States of America, to the undersigned in hand/paid, the receipt of which is hereby acknowledged, does hereby waive, release, remise, and relinquish the undersigned's right to claim, demand, impress or impose a lien for said labor furnished on a [sic] the aforementioned property.

> This is a Partial Waiver Partial Release of Lien by the undersigned for all labor furnished by the undersigned up to the date and amount mentioned.

> IN WITNESS WHEREOF, the undersigned has signed and sealed this instrument the 14 day of December, 2008.

(Doc. 75-6, at 84, Dep. Pereyra, pp 77-78, and Ex. 7).

At the bottom of the Partial Release of Lien are three signature lines.  The first line has the words "Contracting Firm" beneath the line, and that line remains blank.  The second line has the words "Signature of Officer" under the line, and the third line has the words "Title of Officer" underneath.  Pereyra affixed his signature over the second and third signature lines, but provided no title.   Reroof, as the party substituted for KDV, does not dispute the existence and KDV's execution of the Partial Lien Release.  KDV asserts, however, that this Partial Lien Waiver only pertains to the three payments totaling $88,013.92, and does not release or otherwise affect the additional amounts due to KDV/Reroof on the Project.   This document does not specify where it was executed, but Pereyra testified in his deposition that John Wilshusen of Reroof faxed it to him for his signature.  Pereyra testified that he returned to Florida in November of 2008 (doc. 71-1, at 17, pp. 68), so the most likely place of execution of this document was the state of Florida.

On or about February 25, 2010, Rutherford of Grace called Pereyra.  Pereyra understood from the conversation that Rutherford was ready to pay KDV for the remainder of the money Grace owed KDV on the Acme/ITS contract, and that if Pereyra would sign a paper at the office of Grace's lawyer, Francisco Carrales of the law firm Silverberg & Weiss in South Florida, Rutherford would write him a check.  When Pereyra arrived at the law office, the Waiver of Lien, prepared for his signature, stated in pertinent part as follows:

> KNOW ALL MEN BY THESE PRESENTS, that KDV ROOFING, INC., (hereinafter "Subcontractor"), in consideration of the Final payment in the amount of Forty Four Thousand Five Hundred Seventy-Two and 74/100 Dollars ($44,572.74) and other valuable consideration, paid by GRACE CONSTRUCTION, LLC, the receipt and sufficiency of which is hereby acknowledged, does hereby waive and release its lien rights and hereby declares said lien satisfied with respect to the following described project: [Blue Tarp Hurricane Ike Project].

6

> Subcontractor has been paid in full for all amounts due for work or services performed and materials furnished on the above Project and does hereby waive, release, and surrender any and all lien or claim or right of lien for labor, services and/or materials furnished by the undersigned upon or for the Project.

(Doc. 75-6, at 85; Pereyra Dep., Ex. 8).

This Waiver of Lien bears Pereyra's signature on behalf of KDV by its President and states that it was executed at the law offices of Silverberg & Weiss in Broward County, Florida. Pereyra, for whom English is not a native language and who does not read well, did not read the Waiver of Lien before he signed it, but acknowledged in his deposition testimony in June of 2013 that he did sign the February of 2010 Waiver of Lien.  (Doc. 71-1, at 21 & 23, pp. 81-82 &  89).

In their deposition testimonies, Pereyra and Rutherford both testified that they did not know where the $44,572.74 amount on the February 25, 2010 Waiver of Lien came from. Pereyra signed this February 25, 2010 Waiver of Lien even though Grace did not pay on that date or afterwards the $44,572.74, or any other amount due and owing to KDV, except the $88,013.92 previously paid as of the December 2008 date that the Partial Lien was executed.  When, *after* Pereyra signed the February 2010 Waiver of Lien, Corrales came into the room and mentioned the sum of $44,000 and said something about the document Pereyra signed being a final release, Pereyra complained at that time that he did not mean to sign any kind of final release.  Pereyra and Rutherford got into an argument, and Rutherford told him if Pereyra "ever wanted to get this money paid to tell the lawyer that [Pereyra] was agreeing to [the release]."  (Doc. 71-1, at 22 pp. 86).  After Rutherford "snapped," Pereyra left the office.  *Id.*

However, in his affidavit dated January 11, 2011, notarized in Oklahoma County, Oklahoma, Pereyra denies that he signed the February 25, 2010 Waiver of Lien, claiming that the

Waiver of Lien "is a forgery of my signature and I did not sign this Waiver of Lien document in front of a Notary Public and the Notary Public who signed the above mentioned Waiver of Lien document has false attested to my signature.  I Have Not and Do Not waiver, release, and surrender any and all lien or claim or right of lien for labor, services and/or materials furnished for the above mentioned project."  (Doc. 75-6, at 83).  In his deposition,  Pereyra acknowledged signing the February of 2010 Waiver of Lien, but stated that he was confused about what he was signing and that *KDV did not receive the $44,572.74 payment acknowledged in that document either concurrently with the execution of the Waiver of Lien or thereafter.*

In December of 2011, Greeson of Grace spoke with Pereyra asking him to sign yet another Waiver of Lien.  In his deposition testimony in 2013 Pereyra explained that Greeson told him "That was just a paper that we needed – I mean, it was like the first one, but I needed to sign it again because it was – we were getting very close to getting paid [on the Blue Tarp Project]." (Doc. 71-1, at 26, pp. 103).  Accordingly, Greeson sent a second Waiver of Lien to Pereyra, identical in content to the first Waiver of Lien signed in February of 2010.  Pereyra did not read the document, but he took it to the bank where he lived, signed this second "Waiver of Lien," and faxed it to Greeson.   This document reflects the same amount of consideration and has the same language as the February 25, 2010 document  except that it is signed in Polk County, Florida, at a later date in front of a different notary public.  However, no party provides any evidence that Pereyra and/or KDV received the $44,572.74 in consideration, and Pereyra testified that the consideration was never in fact paid.

On July 8, 2013, Reroof and Grace received a final master spreadsheet from Acme for work performed on the Blue Roof Project, reflecting the amount Acme paid to Grace and listing

each right of entry for which Grace was paid and the corresponding square footage.  Assuming the information on the spreadsheet is accurate, Wilshusen of Reroof calculated that Reroof is still owed $160,227.58 for the completed right of entries for KDV's work on the Project.   Grace disputes the accuracy of these calculations, but asserts that these calculations are irrelevant to the issues presented in its motion.

On September 22, 2008, Pereyra signed an Assignment of Accounts receivable on behalf of himself as an individual and as managing parter of KDV, assigning KDV's interests to Reroof. (Doc. 71-1, at 40-44).  Thus, because of that assignment, the court has substituted Reroof for KDV as real party in interest.  KDV dissolved in 2010.

<u>Grace's Dealings with Bennett Lumber</u>

Bennett Lumber, located in Piedmont, Alabama, whose owner and sole member is James Bennett, has a history of providing yellow pine furring strips to FEMA projects for hurricane relief.  Therefore, in September 2008 after Hurricane Ike, Bennett heard that Acme/ITS had received a government contract, and he contacted Acme/ITS about supplying furring strips, which are used to affix blue tarps to damaged roofs for hurricane relief. Acme/ITS referred Bennett to Grace employees David Greeson and Steven Rutherford, and the company informed Bennett that Grace would be the primary contact for furring strips and that any sales would go through Grace.  Bennett then spoke with Rutherford over the telephone.  As a result of Rutherford's statement that Grace would be interested in purchasing furring strips, Bennett traveled that same month to the fairgrounds at Hitchcock, Texas, the central location for hurricane relief efforts, to meet with Grace personnel.

At that meeting, Grace and Bennett Lumber reached a verbal agreement that Bennett

Lumber would provide an 8 foot long 1"x 2" furring strips of pressure-treated yellow pine for a price of $0.77 each; the parties did not execute a written contract.  Bennett was told that he would be sending three or four loads of furring strips per week.

In October of 2008, soon after the September meeting in Hitchcock, Bennett Lumber began shipping furring strips to Grace.  C.W. Tate and Ted Morgan, whom Rutherford and Greeson introduced to Bennett as the people responsible for receiving and ordering shipments, called Bennett Lumber to place telephone orders as needed, and Bennett Lumber delivered to Grace at the Hitchcock, Texas site over 13,000 pieces of furring strips in the month of October 2008.

The evidence reflects that Grace received a Bennett Lumber shipment on October 8, 2008, which C.W. Tate received.  In check # 1169 dated November 28, 2008, Grace paid invoice #212487 for a shipment in the amount of $9,655.59.  In check # 1170 with the same date, Grace paid invoice #212489 for the October 8 shipment in the amount of $9,655.59.  Although Bennett Lumber continued to ship furring strips to Grace, Grace did not pay all invoices.  At some point, two or three weeks after Bennett Lumber began shipping to Grace, Bennett got a call from his wood preserving company stating that "they rejected this load."   Some dispute exists about the content of this phone call.  To the extent, if any, that Grace is asserting that any of the wood rejected is associated with the unpaid invoices Bennett Lumber claims in this lawsuit, Bennett Lumber disputes that assertion; Bennett Lumber asserts no loads of rejected wood are included in its total claim in this lawsuit.  Rather, Bennett Lumber asserts that the listed unpaid invoices it claims correspond to wood shipments Grace accepted but did not pay for.

Bennett testified that the cut-off for the project with Grace was October 20, 2008, and

Bennett Lumber's last invoice on the project (#212520) was for wood delivered on October 17, 2008 due and payable on November 17, 2008.  Bennett Lumber lists the unpaid invoices on the project as follows: invoice #212486 in the amount of $10,053.12; invoice #212488 in the amount of $10,053.12; invoice # 212490 in the amount of $10,053.12; invoice #212407 in the amount of $9,461.76; invoice # 212508 in the amount of $$9,461.76; and invoice #212520 in the amount of $10,053.12 plus the "short paid" amount of $1,533.94 for a total due on the project of $60,669.94.  Bennett Lumber now claims a total balance due of $50,669.94 because Campbell, the next general contractor on the Hurricane Ike Project, eventually paid $10,000.00 of the $60,669.94 balance due to Bennett Lumber, resulting in a remaining balance of $50,669.94.

Grace asserts that Bennett received many more checks on the Grace project than those provided as exhibits to his deposition.  In any event, regardless of the number of shipments to Grace and payments on its behalf, these invoices listed above as unpaid are the ones that Bennett currently asserts are due and owing based on shipments accepted for the Blue Tarp Project. Grace has provided no *evidence* that Bennett Lumber received payment for the $50,699.94 balance that Bennett Lumber now asserts is due.  Bennett Lumber made repeated efforts via telephone to obtain payments from Grace.

According to Grace, the wood upon which Bennett Lumber is making its claim was used on the Campbell portion of the Hurricane Ike Blue Tarp Project, not the Acme/ITS portion. However, Bennett Lumber insists that the shipments upon which the unpaid invoices were based were made pursuant to its agreement with Grace for the Acme project later taken over by Campbell, and not pursuant to a contract with Campbell directly.   Bennett Lumber provides evidence that Campbell paid it for lumber shipped to Campbell based on an agreement directly

11

with Campbell, so the only shipment payments outstanding are those that Grace owes.   Grace

provides no contradictory evidence based on personal knowledge.

In the latter part of October of 2008, David Greeson advised Bennett that the Department

of Labor had shut down his operation and that Grace would pay Bennett Lumber as soon as

Grace could work out its differences with the Department.  As a result of that information,

Bennett retrieved 18 truck loads of furring strips in Houston, Texas that he had originally

intended for Grace and that included wood specifically cut and shipped for the Blue Tarp Project.

However, Bennett Lumber is not now asking Grace to pay for these 18 truck loads; the claim for

$50,699.94 does not include those retrieved loads.

In his deposition, Bennett testified that Greeson of Grace subsequently called him and

said, "We can get you some money, and I can get you paid, but I've got to get you to sign this

[release] to turn the money loose where I can get paid."  (Doc. 71-2, at 9, pp. 35).

 In a letter dated May 21, 2010, listing "Re: Grace Construction LLC - Final Payment to

Bennett Lumber," Francisco Corrales of the law firm of Silverberg & Weiss, stated:

> As we have stated to you before, Grace Construction LLC, by way of its
> prime contractor, STM Consultants (Roy Campbell), has been ready,
> willing and able to pay all amounts legally due to Bennett Lumber
> Company.  With the help of your letter, we now have agreement as to the
> amounts owed . . . .  Now that Bennett Lumber has confirmed that it is
> owed $62,203.88, representing the original $60,669.94 plus the $1,533.94
> in short pays, we expect all parties to cooperate and work together so that
> Bennett Lumber Company may finally be paid *this amount* by STM
> Consultants. To that end, please find a lien release enclosed.

(Doc. 73-5, at 20) (emphasis added).  The $62,203.88 sum in this letter appears to be a mistake in

that the $1533.94 amount in short pays is included in and not additional to the correct sum of

$60,669.94, which may explain the discrepancy between the total amount Corrales lists as owed

12

($62,203.88) and the amount Bennett Lumber now claims ($60,669.94 - $10,000).   Further, the

$62,203.88 does not take into account the $10,000.00 paid to Bennett Lumber by Roy Campbell

after the date of the letter.

Enclosed with the May 2010 letter from Silverberg & Weiss was a Waiver of Lien.  That

document provides in pertinent part:

> BENNETT LUMBER COMPANY, LLC (hereinafter "Subcontractor"), for
> and in consideration of the payment of the sum of Sixty Two Thousand
> Two Hundred Three and 88/100 Dollars ($62,203.88) and other valuable
> consideration, paid by GRACE CONSTRUCTION, LLC, the receipt and
> sufficiency of which is hereby acknowledged, does hereby waiver and
> release its lien rights and hereby declares said lien satisfied with respect to
> the following described projects: [Blue Tarp Hurricane Ike project].
>
> Subcontractor has been paid in full for all amounts due for materials
> furnished and work or services performed on the above Project and does
> hereby waiver, release and surrender any and all lien or claim or right of
> lien for labor, services and/or materials furnished by the undersigned upon
> or for the Project.

(Doc. 73-5, at 17).

Bennett understood this letter as validating what Greeson had said, representing that if he

signed the Waiver of Lien, then Bennett Lumber would receive the full balance owed.  When

asked in his deposition whether he signed the release under duress, Bennett testified, "Well, the

duress was that I might not get paid. . . . . That's what it was going to take to get it going."  (Doc.

71-2, at 9 pp. 35-36).  Accordingly, in reliance on that representation, Bennett signed the Waiver

of Lien as President of Bennett Lumber Company LLC with a notarized signature date of July 20,

2010. He enclosed the signed Waiver of Lien in a letter to Attorney Corrales, also dated July 20,

2010, stating "I am informing you of my acceptance to settle this account."  (Doc. 73-5, at 18).

Unfortunately, after signing the Waiver of Lien, Bennett Lumber did not receive the

13

balance due from Grace, or from STM/Campbell/All American Brothers, the second general contractor on the Hurricane Ike Blue Tarp Project to whom the Corrales letter referred.  On August 4, 2010, Bennett wrote a "To Whom it May Concern" letter to the insurance company providing a bond for All American Brothers, notifying the company that Grace, a subcontractor, had not paid Bennett Lumber for the material purchased for Hurricane Ike's Blue Tarp Project.

Eventually, Bennett began contacting Campbell and asking for payment.  Bennett testified that he "was looking for Grace to pay me" because his agreement regarding the unpaid wood was with Grace,  not with Campbell.  (Doc. 71-2, at 9, pp 33 & 12, pp. 48).  However, because Greeson and Corrales told Bennett that Campbell was going to pay it, and because Bennett understood that Greeson and Campbell had worked out an agreement for Campbell to pay Bennett Lumber, Bennett explained,  "I was looking in both directions, you know, for whatever I can get whenever I can get it." (Doc. 71-2, at 10, pp. 39-40 & 13, pp. 59).  In 2011, Bennett Lumber finally received partial payment, receiving two payments of $5,000.00 each from Campbell, one deposited on April 18, 2011 and the other deposited on June 14, 2011.  Bennett Lumber accepted these payments and credited them to Grace's balance owed, reducing it from $60,699.94 to $50,699.94.  However, Grace did not advise Bennett that Campbell would be paying the invoices until *after* Bennett Lumber had completed the shipments in question based on the agreement with Acme/ITS/Grace and attempted to collect from Grace the amount due on the invoices for those shipments.

On December 13, 2011, after months elapsed with no payment from Grace, STM Consultants or Campbell, David Greeson of Grace sent to Bennett a fax stating "James, Please Resign This!  I know we have Already Done This but, Please!! I may finally get some Money!

14

Thanks David  P.S. Steve my partner is leaving for [Afghanistan] Jan 10 for 510 days I Hoped to

Have this completed before then!"  (Doc. 73-5, at 21).  The attached Waiver of Lien included  the

same language as the one signed on July 20, 2010 and listed the same amount of consideration.

Bennett did not sign this Waiver of Lien, and received no more money from any source on the

Blue Tarp Project.

## IV.  DISCUSSION

In its motion for summary judgment, Grace does not assert that the claims of Bennett

Lumber and KDV/Reroof were not due and owing for services performed on the Blue Tarp

Project.  Rather, Grace asserts that, regardless of whether some entity indeed owed those

amounts, the claims of both Bennett Lumber and KDV/Reroof are now barred by release and

waiver, and that Bennett Lumber's claims are also barred by the applicable statute of limitations.

Statute of Limitations

The court will first address the statute of limitations issue, asserted only against the

claims of Bennett Lumber.

In a diversity case, federal courts apply the "conflict of laws rules of the courts of the

states in which they sit."  *Griffin v. McCoach,* 313 U.S. 498, 503 (1941).  As this court sits in

Alabama, the court looks to that state's conflict of laws rules.  Under Alabama law, the law of

the forum applies to *procedural* matters.  *Middleton v. Caterpillar Indus., Inc.,* 979 So. 2d 53, 57

(Ala. 2007); *Etheredge v. Genie Indus., Inc.,* 632 So. 2d 1324, 1326 (Ala. 1994); *see also*

*Precision Gear Co. v. Continental Motors, Inc.,* ___ So. 3d ____,  2013 WL 3481949, *3 (Ala.

July 12, 2013).  Alabama law further provides that, "[b]y legal tradition, most statutes of

limitations are deemed procedural rather than substantive."  *Etheredge,* 632 So.2d at 1326.

Accordingly, Alabama courts, and federal courts sitting in Alabama with diversity jurisdiction will normally apply Alabama statutes of limitations and will only apply another state's statute of limitations *"when it is demonstrated that 'the limitation is so inextricably bound up in the statute creating the right that it is deemed a portion of the substantive right itself.'" Id.* at 1327 (quoting *Cofer v. Ensor,* 473 So. 2d 984, 987 (Ala. 1985)).  As no party has demonstrated such an inextricable bond applies in the instant case, the court FINDS that the Alabama statute of limitations applies here.

The court must next determine *which* Alabama statute of limitations applies.  Grace argues that the applicable Alabama statute of limitations is the three year statute:

> **Three-year limitations**
> The following must be commenced within three years:
>     (1) Action to recover money due by open or unliquidated account, the time to be computed from the date of the last item of the account or from the time when, by contract or usage, the account is due. . . .

Ala. Code § 6-2-37 (1975).

Bennett Lumber argues, on the other hand, that the six year statute of limitations applies because the account in question is an "account stated," not an open account.  Section 6-2-34 provides as follows:

> **Six-year limitation**
> The following must be commenced within six years:
> ***
> (5) Actions for the recovery of money upon a loan, upon a stated or liquidated account or for arrears of rent due upon a parol demise . . . .

Ala. Code § 6-2-34 (1975).

In the case of *Wyatt v. Bradford & Co.,* 456 So. 2d 822 (Ala. Civ. App. 1984), the Alabama Court of Civil Appeals addressed whether an unpaid bill after Hurricane Frederick was

16

an open account or an account stated.  Explaining that "[t]he definition of an account stated is

well-settled law," the court stated the law as follows:

> An account stated is not founded on the original liability but is a new
> agreement between parties to an original account that the statement of
> the account with the balance struck is correct and that the debtor will pay
> that amount.  Stated differently, an account stated is an account balanced
> and rendered with an assent to the balance, express or implied; so that
> the demand is essentially the same as if a promissory note had been
> given for the balance.  An account is rendered when it is presented to the
> debtor.  An account which has been rendered but which is not objected
> to by the debtor within a reasonable time after its rendition becomes an
> account stated, for the debtor's failure to object is regarded as an
> admission by him of the correctness of the account.

*Id.* at 823  (Internal quotations and citations omitted).

The Alabama Supreme Court has also explained, on the other hand,  that a claim "to

proceed on an *open account* theory, [the plaintiff] must prove by competent evidence that some

term of the contract was left open and undetermined by the parties."  *Car Center, Inc. v. Home

Indem. Co.,* 519 So. 2d 1319, 1323 (Ala. 1988).

Applying these definitions, the court FINDS that the account in question is a stated

account.  As is clear from Attorney Carrales's letter, who said "we now have an agreement as to

the amounts owed," a subsequent new "agreement" existed between Bennett Lumber and Grace

that the balance due Bennett Lumber of $62,203.88 was "confirmed."  (Doc. 73-5, at 20).  The

fact that Grace expected and hoped that a third party, STM Consultants (Roy Campbell), would

pay that amount does not change the fact that it agreed to the amount owed Bennett Lumber

under the agreement between Bennett Lumber and Grace.   The evidence reflects that Bennett

Lumber negotiated the original contract with Grace, before Roy Campbell was involved, and

shipped the lumber to Grace before it received any notification that Roy Campbell would pay

for that lumber.  The evidence further reflects that Attorney Corrales wrote the letter in May of 2010, confirming both the amount due to Bennett Lumber and the existence of the  "new agreement" for that amount, and Corrales did not characterize himself as an attorney or representative of STM Consultants/Roy Campbell.   Accordingly, this letter memorialized a new agreement in May of 2010 between Bennett Lumber and Grace as to the amount now due Bennett Lumber based on Bennett Lumber's 2008 performance of their previous agreement. The court FINDS that the six year statute applies to this account stated.

In its reply, Grace claims that the "account stated" does not apply.  It argues that because one of the elements of a *prima facie* case for "account stated" is that the debtor admits liability and because Grace does not admit liability, Bennett Lumber cannot invoke the account stated. Although Grace may not admit that it is liable, it does admit that *some entity*—and Grace points to Campbell—owes Bennett Lumber the balance Bennett Lumber is claiming on the new agreement with Grace.  Accordingly, the court finds that account stated nevertheless applies.

Finally, because the six-year period has not expired from this 2010 agreement and any subsequent breach of it, the court FINDS that the six-year statute does not bar Bennett Lumber's claims to the interpled funds in this 2012 lawsuit.

Waiver and Release

Grace next argues that Bennett Lumber and KDV/Reroof are barred from making claims to the interpled funds because of waiver and release. In support of that argument, it presents the executed Waiver of Lien dated July 20, 2010 with James Bennett's signature as President of Bennett Lumber and three documents signed by Rafael Pereyra for KDV, a Partial Release of Lien and two Waivers of Lien.

*Bennett Lumber Company's Waiver of Lien*

In addressing whether the Waiver of Lien bars the claims of Bennett Lumber,  both Grace and Bennett Lumber cite Alabama law, and the Waiver of Lien purports to be signed and notarized in Calhoun County, Alabama.  Accordingly, the court will apply Alabama law in resolving this issue as to Bennett Lumber.

When addressing Bennett Lumber's claims, Grace does not argue that it, or anyone else on its behalf, has in fact paid Bennett Lumber the balance due on the Blue Tarp Project of $50,669.94.   In its reply, Grace acknowledges that "[t]he undisputed evidence in this case shows that STM Consultants (Roy Campbell), owes Bennett Lumber the money sought in this action."  (Grace's Reply Br., Doc. 76, at 2).  Neither Bennett Lumber nor this court would agree that evidence presented shows as an *undisputed* fact that STM owes Bennett Lumber the amounts claimed *but Grace[1] does not.*   However, Grace's acknowledgment that Bennett Lumber has *not* been paid the amounts claimed in this lawsuit is significant because this acknowledgment shows a failure of consideration for the Waiver of Lien upon which Grace relies for its argument that Bennett Lumber has waived and released any claim to the unpaid balance.

---

[1] Grace argues that STM/Roy Campbell is the entity that should have paid the balance, but Bennett Lumber has presented evidence that James Bennett dealt with and reached an agreement with Grace employees, that Bennett Lumber shipped wood to Grace, and that Grace paid for some but not all shipments.  Although STM/Roy Campbell did eventually pay Bennett Lumber $10,000.00, the evidence reflects that Bennett Lumber first attempted to obtain payment from Grace and contacted Campbell for payment not based on any agreement between Bennett Lumber and Campbell, but instead, based on a presumed agreement between Grace and Campbell that Campbell would pay Bennett Lumber.  Further, in referring to the a new agreement in the May 21, 2010 letter, Attorney Corrales did not purport to represent Campbell.  Therefore, evidence supports Bennett Lumber's claims that its agreement regarding the unpaid lumber was with Grace and not STM/Roy Campbell.

Bennett Lumber argues, on the other hand, that he only signed the Waiver of Lien upon the false representation from Grace that if he signed it, Bennett Lumber would be paid the balance due, a payment that he never received.

Bennett Lumber presents evidence that President Bennett received a phone call from Greeson at Grace falsely representing that Bennett would receive payment of the full balance due of over $60,000.00 if he would sign a Lien Waiver.  As a follow-up to that representation, Bennett Lumber received a May 21, 2010 letter from Grace's Attorney Corrales, stating that Grace

> by way of its prime contractor, STM Consultants (Roy Campbell), has been ready, willing and *able to pay all amounts legally due to Bennett Lumber. . . .* With the help of your letter, we now have an *agreement as to the amounts owed*. Now that Bennett Lumber has confirmed that it is owed $62,203.88 . . . , we expect all parties to cooperate and work together so that Bennett Lumber Company may finally be paid this amount by STM Consultants.  To that end, please find a lien release enclosed.

(Doc. 73-5, at 20) (emphasis added).

The enclosed Waiver of Lien, signed by James Bennett as President of Bennett Lumber and dated July 20, 2010, states in relevant part:

> BENNETT LUMBER COMPANY, LLC (hereinafter "Subcontractor"), for and in the consideration of the payment of the sum of Sixty Two Thousand Two Hundred Three and 88/100 Dollars ($62,203.88) and other valuable consideration, *paid by GRACE CONSTRUCTION, LLC*, the receipt of which is hereby acknowledged, does hereby waive and release its lien rights and hereby declares said lien satisfied with respect to the following described projects: [Blue Roof Project for Hurricane Ike].

(Doc. 73-5, at 19) (emphasis added).

Bennett testified that based on the Greeson telephone call, confirmed by the Corrales letter, he was told that signing the Waiver of Lien was a *prerequisite* to receiving the funds.

20

Thus, his signing was not a true acknowledgment of receipt of the funds. To the contrary, Bennett Lumber presents evidence that as of the July 20, 2010 date Bennett signed the Waiver of Lien, he in fact had *not received* the $62,203.88 to which the Lien Waiver referred. The only payment he subsequently received on this account with Grace were two payments of $5,000.00 each received from Roy Campbell in 2011, almost a year after he signed the Waiver of Lien, and after he had made numerous attempts to collect the account balance from both Grace and Roy Campbell. In short, Bennett Lumber did not receive the promised consideration for signing the Waiver of Lien.

Grace does not dispute Bennett Lumber's evidence of failure of consideration with any evidence other than the Waiver of Lien. It first relies on the unambiguous wording of the Waiver of Lien itself, asserting that "extrinsic evidence should not be considered in determining the true intent of the parties and the clear and unambiguous language of the release should be enforced." (Grace's Br., doc. 70, at 18).

In relying on the unambiguous wording of the Waiver of Lien and arguing that the court cannot look beyond that document, Grace ignores two well-established tenets of Alabama law: (1) that "[p]arol evidence is always admissible to show . . .a lack or failure of consideration"; and (2) that "[e]vidence of fraud is always admissible, even though there is a completely integrated writing." *Parker v. McGaha,* 321 So. 2d 182, 185 (Ala. 1975). However, in the instant case, as discussed above, Bennett Lumber provides evidence—that no other party disputes except by proffering the Waiver of Lien document—establishing that it did not receive consideration for the July 2010 Waiver of Lien and that Bennett only signed it based on the representation that if he did so, the money would be paid.

21

Grace argues that, even if Bennett Lumber never received the consideration specified in the Waiver of Lien, which it characterizes as a release, the release is nevertheless enforceable because Section 8-1-23 of the Alabama Code says so.  Section 8-1-23 provides: "An obligation is extinguished by a release therefrom given to the debtor by the creditor upon a new consideration or in writing with or without new consideration."  Ala. Code § 8-1-23 (1974).

Grace acknowledges that Bennett Lumber did not receive the consideration specified in the Lien Waiver, but further argues that, because the release is in writing, it is enforceable without new consideration.  To the extent that Grace is arguing that the legislature intended, in enacting this law, to bind a party to a release based on payment of consideration that the other party *failed to deliver*, the Alabama Supreme Court has specifically rejected that interpretation.

In *Mitchell v. Cobb,* 16 So. 2d 918  (Ala. 1960), the Court addressed this section and explained that "it could not have been the intention of the legislature to enact a law which would make it impossible for a court to correct a manifest error or injustice and to bind one party to a transaction when the other party has failed to deliver the consideration for which the act was done."  *Id.* at 922.  In that case, the party releasing the mortgage did so in writing but by unilateral mistake: he signed the release in consideration of the execution and delivery of a deed but the consideration was not given.  The Supreme Court stated: "The complainants cannot insist on the one hand that they are entitled to have the benefit of the cancellation and the release of the property from the lien of the mortgage and at the same time deny to appellants the consideration which alleged moved [the other party] to enter such cancellation and to execute such relief."  *Id.* at 921.

The cases addressing Section 8-1-23 state that this section merely allows the enforcement

of a release and settlement of a "matured and undisputed claim," *Grand Lodge Knights of Pythias of N.A. v. Williams,* 16 So. 497, 500 (Ala. 1944).  The cases explain that the parties may agree to and enforce a release executed with new consideration or even one without new consideration *if* they agree that no consideration is necessary and if they put the release in writing.  According to the Alabama Supreme Court, however, the section does *not* provide that *if the written release agreement is based on new consideration*, the releasee can fail to provide the specified consideration and expect to enforce the release.  The instant case is not one in which the parties have agreed to a release without consideration and have put that agreement in writing; rather, it is one in which the parties agreed to a release based on specified consideration and the specified consideration was not in fact paid.  Under these circumstances, the Alabama Supreme Court has refused to enforce the release.  *See Mitchell,* 16 So. 2d at 921-22.

In addition to Section 8-1-23, Grace proffers three Alabama cases that, it says, support enforcing the Waiver of Lien to bar Bennett Lumber's claims in the instant case.  Grace presents the case of *Wayne J. Griffin Electric, Inc v. Dunn Const. Co.,* 622 So. 2d 314, 317 (Ala. 1993) for the proposition that "absent fraud, a release, supported by valuable consideration and unambiguous in meaning, will be given effect according to the intention of the parties from what appears in the four corners of the document itself."  In that case, after substantially completing a construction project, subcontractors submitted to the general contractor a one-page release stating that each "releases and waives any and all claims and liens [of] whatsoever kind or nature against [the general contractor] which in any way relate to the above mentioned construction improvement and projects. Subcontractor makes this Affidavit to induce payment in the amount of $____ and on receipt of said payment by Subcontractor this release of claim and waiver of lien

becomes in full force and effect." *Id.* at 316.

The subcontractors signed the release and notaries executed them, and none of the signees for the subcontractors discussed the releases with any representative of the general contractor. When, several weeks after the project's completion, subcontractors submitted claims for extra compensation for delays occurring before execution of the releases, the general contractor sued for judgment declaring that the releases barred the claims. The trial court found the releases to be enforceable and granted summary judgment for the general contractor. On appeal, the Supreme Court of Alabama affirmed, stating "the subcontractors presented no evidence that they were fraudulently induced into executing the releases," and thus, finding that the unambiguous terms of the contract were due to be enforced. *Id.* at 317.

The *Griffin Electric* case is distinguishable from the instant case in several respects. In the *Griffin* case, the release did not mention a particular sum paid as consideration that was not in fact paid, as the evidence reflects in the instant case. Another distinction is that the general contractor in that case did not communicate with the subcontractors at all in connection with the releases, so no allegations existed of fraudulent inducement to sign the releases, or of mutual mistake that a third party would pay the consideration, allegations that exist in the instant case. In short, the proposition of law set forth in the *Griffin* case—that "*absent fraud*, a release, *supported by valuable consideration* and unambiguous in meaning, will be given effect according to the intention of the parties"—does not support enforcing the Waiver of Lien as a bar to recovery in the instant case. *See id.* at 317.

Grace relies upon another Alabama case, *Fountain Building & Supply Co.. v. Washington,* 602 So. 2d 362 (Ala. 1992), in support of its argument that the Waiver of Lien is

enforceable to bar Bennett Lumber's claims.  In *Fountain*, the supplier filed a materialmen's lien against a general contractor who had failed to pay for the materials supplied.  When the contractor later attempted to obtain a construction loan from a bank, the bank refused to do so unless the lien was released.  The contractor then contacted the supplier, who agreed to release the lien in exchange for a promissory note for the amount of the debt, to be paid nine days after the date of the release, and secured by a mortgage on another lot.  When the supplier did not receive payment on the promissory note, it re-filed the materialmen's lien, and eventually filed a complaint seeking to establish its lien and to obtain a money judgment against the contractor and also naming the bank as the construction loan mortgagee on the original lot.  The bank counterclaimed, seeking a judgment declaring the supplier's lien to be void.  After an *ore tenus* proceeding, the trial court held that the supplier was barred under the doctrine of estoppel from enforcing the lien based on the delivery of the release of the lien, and denied all claims of fraud.

On appeal, the Supreme Court of Alabama affirmed, holding that the lien was extinguished by release and could not be re-filed.  In so ruling, it quoted the same language "[absent] fraud, a release, supported by valuable consideration and unambiguous in meaning, will be given effect according to the intention of the parties from what appears in the four corners of the document itself . . . ." *Id.* at 365.  The supplier argued that the release was conditioned upon its right to re-file a lien if the amount due was not paid, and that the bank was well aware of its conditional nature.  However, the court refused to allow the supplier to vary the unambiguous terms of the release "because the release was supported by valuable consideration, a mortgage on another lot" and "because there was no evidence of fraud on the part of [the contractor]."  *Id.* at 365.

While Grace cites *Fountain* to support its argument that an unambiguous release is enforceable even when the party released does not pay the consideration listed in the release, that argument is a mis-reading of *Fountain*.  Although the contractor in *Fountain* did not pay the promissory note, it did provide, as the Supreme Court carefully noted, other valuable consideration specified in the release: the mortgage on the other lot.  Further, *Fountain* represents an attempt to re-file and enforce a released lien, and the instant case represents an attempt not to enforce a released lien but to claim funds based on the underlying debt promised as inducement for the waiver.  For those reasons, as well as others, *Fountain* is inapposite and does not support Grace's position.

The final case that Grace cites to support the enforceability of the Waiver of Lien is *Steward v. Turner,* 551 So. 2d 374 (Ala. 1989).  In that case, Steward contended that the release was void for lack of consideration because he executed it in exchange for Turner's oral promise to pay his medical expenses, which Turner ultimately refused to do.  The release itself recited that the consideration for the release was $10 and other valuable consideration.  However, the evidence reflected that the "other valuable consideration" was a "1969 Oldsmobile which [Turner] gave [Steward] in full release of any claim [Steward] might have against [Turner]," and Steward did not provide any evidence contesting this statement.  *Id.* at 375.  The trial court granted summary judgment, finding that the executed release barred the action.  In light of the undisputed evidence that the release was supported by consideration, the Supreme Court affirmed the trial court's ruling.  *Id.*  As is clear from this recounting, the *Steward* case does not support Grace's position in the instant case that the July 2010 release bars Bennett Lumber's claims despite the failure to provide the consideration specified the Waiver.

26

The court returns to Grace's acknowledgment that Bennett Lumber has never received the full consideration recited in the Waiver of Lien.  Although Grace points to Roy Campbell as the culprit who failed to pay, the acknowledgment from both Bennett Lumber and Grace that a failure of consideration exists for the Waiver of Lien means that Alabama law does not support its enforceability.   *See Walton v. Beverly Enters.-Ala., Inc.,* 4 So. 3d 537, 541 (Ala. Civ. App. 2008).

Accordingly, to the extent that Grace's motion for summary judgment is based on the Waiver of Lien signed on behalf of Bennett Lumber, the court FINDS that the motion is due to be DENIED.  Having so found, the court need not determine whether the statements by Greeson and Attorney Corrales represent fraud in inducing Bennett's signature on the Waiver of Lien and need not determine whether the Waiver of Lien, if it were enforceable, actually released the claims in question.  Bennett Lumber may present its claims in this lawsuit for the balance due of $50,669.94.

### KDV/Reroof Waiver of Lien Documents

In its motion for summary judgment, Grace asserts similar arguments against the claims of Reroof, arguing that KDV waived and released its claims against Grace for money due on the Hurricane Ike Blue Tarp Project.  Thus, Grace asserts the claims of Reroof, which stands in KDV's shoes as the real party in interest, are unenforceable.

Reroof responds that, in the documents upon which Grace relies, KDV only waived and released a lien, not the underlying debt, and that, in any event, the last two Waivers of Lien that KDV executed are unenforceable because of a failure of consideration.

Because Reroof presents Texas law as applicable and Grace presents Florida law as

applicable, the court must first determine which state law applies to this issue.  As noted earlier, this federal court, which sits in Alabama, applies the conflicts of law rules of Alabama. "Alabama follows the principle of 'lex loci contractus,' which states that a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction.  Alabama law has long recognized the right of parties to chose a particular state's laws to govern an agreement." *Cherry, Bekaert & Holland v. Brown,* 582 So. 2d 502, 506 (Ala. 1991) (citations omitted).

The parties apply those principles differently.  All parties acknowledge that the subcontract between Grace and KDV was executed and performed in Texas, so absent an express reference in the contract to another jurisdiction, Texas law would apply *to claims involving the performance of that contract*.  Reroof asserts that Texas law does indeed apply to all the contract issues involving KDV/Reroof's claims in this suit.

However, the evidence reflects that Pereyra signed the Partial Lien Waivers and Waivers of Lien in Florida.

To complicate matters, Grace cites Alabama law in its original brief, and then, in its reply,  argues that Florida law should apply.  As support for the argument in favor of applying Florida law, it points to the following provision in the subcontract:

> 12.  Governing Law.  This Agreement shall be governed by Florida law, without regard to its conflict of laws principles.  Venue of any action brought, being enforced, or related to this Agreement shall be brought exclusively in a court of competent jurisdiction in Broward County, Florida, to which each Party consents to personal jurisdiction, by execution of this Agreement.  The prevailing Party in any dispute resolution proceeding shall be entitled to an award of attorney's fees.

(Doc.  71-1, at 84).

Based on the subcontract's express provision that Florida law applies to it, and also based on the evidence that the Partial Release of Lien and the two Waiver of Liens were created in Florida, the court FINDS that Florida law applies to the claims involving KDV/Reroof.

*Partial Lien Waiver*

Grace argues that this Partial Release of  Lien releases any further claims to money owed on the Blue Tarp Project.  As the argument goes, because Pereyra acknowledges signing the document, and  acknowledges receiving the $88,013.92 in consideration that the document recites, his execution of the document in December of 2008 meant that he released any claims to any other money owed him on the project as of that date.  Further, because Pereyra acknowledges that his work on the Blue Tarp Project ended *before* he signed the document*,* Grace argues that he essentially released any claim to any payment over the $88, 013.92.

Reroof responds that the wording of the Partial Release of Lien does not support Grace's argument; that the document does *not* purport generally to release the underlying debt for all work performed on the Blue Tarp Project as of that date.  Rather, it releases the lien itself.

The court agrees with Reroof.  The wording of the document in question states that, in consideration of $88,013.92, "the undersigned . . . does hereby waiver, release, remise, and relinquish the undersigned's right to claim, demand, impress or impose *a lien* for said labor furnished on the aforementioned property.  This is a Partial Waiver and Partial Release *of Lien* by the undersigned for all labor furnished by the undersigned up to the date and amount mentioned." (Doc. 71-1, at 89) (emphasis added).  The document does what its title says it does: it is a partial release of a lien and partial waiver of any right to demand or impose a lien up to the $88,013.92 amount.  However, it does not state that KDV has been paid in full for all work performed up to

29

that date and it does not release any claim to the debt underlying any lien.  Accordingly, the court

FINDS that the Partial Release of Lien dated December of 2008 provides no bar to

KDV/Reroof's claiming against Grace payment owed in addition to the $88,013.92 admittedly

paid.

In support of its argument that the Partial Release of Lien does indeed release all claims

of KDV/Reroof, Grace offers two cases:  *Westinghouse Electric Supply Co. v. Levin,* 115 So. 2d

423 (Fla. 1959) and *Addicks Services, Inc. v. GGP-Bridgeland, L.P.,* 596 F.3d 286 (5th Cir.

2010) (applying Texas substantive law and federal procedural law).

In *Westinghouse*, the supplier sought to foreclose a mechanic's lien against a contractor

for materials furnished through an electrical subcontractor.  The contractor pleaded waiver and

release of the liens in question, which had the printed words "Waiver of Lien" as a title and on

which the lienors had handwritten "Partial" when they signed it.  The Florida trial court

dismissed the complaint, and the supplier appealed.  The Florida District Court of Appeals held

that the text of the waiver clearly and unambiguously stated that the signees waived and released

their claim of lien on the land involved, and therefore waived and released their claim of lien

even though they wrote the word "Partial" in the title of the waiver.  *Id.* at 425.

While *Westinghouse* would support Grace *if* KDV/Reroof were attempting to enforce a

lien after it had released its right to do so, that scenario is not before this court.  Reroof is not

attempting to enforce a *lien*; it is claiming the right to pursue the underlying remaining debt that

Grace still owes through means *other than* enforcing a lien.  Accordingly, the *Westinghouse* case

does not support Grace's argument that the signing of the Partial Release of Lien, which only

purports to release the lien, bars Reroof's right to pursue the claims in this lawsuit.

In *Addicks,* the Fifth Circuit Court of Appeals addressed the effect of a waiver under Texas law and not Florida law.  The contract in question specified that plaintiff Addicks would receive monthly progress payments from the defendant developer, and to receive the monthly payments, Addicks would submit to the developer an application detailing work performed. accompanied by an executed lien waiver.  The form of the  "Waiver and Release of Lien upon Progress Payment" attached to the contract contained the following language:

> [Addicks], in consideration of the sum of $_____, hereby waives and releases its lien and right to claim a lien for labor, services, or materials furnished through — (date of this waiver) under contract with _____ on the job of _____ (Owner) to the following property: _____ (Name and Address of Project).  This waiver and release does not cover any retention or labor, services or materials furnished after the date specified.  Any and all ... subcontractors ... have been paid and satisfied in full, and *there are no outstanding claims of any character arising out of, or related to, the undersigned's activities on, or improvements to, the Project.  This Waiver constitutes a representation by [Addicks] that the payment referenced above, once received, constitutes full and complete payment for all work performed, and all costs or expenses incurred . . . relative to the work or improvements at the Project as of the date of this Waiver*, except for the payment of retainage. *[Addicks] specifically waives,* quitclaims and releases any claim for damages due to delay, hindrance, interference, acceleration, inefficiencies or extra work, or *any other claim of any kind it may have ... as of the date of this Waiver*, except as follows:
> [place to write in exceptions].

*Id.* at 290 (emphasis added).

During the project, Addicks submitted applications for progress payments and  attached fifteen executed interim waivers, using the form quoted above, and the executed waiver forms did not include any listed exceptions.  Because of disputes over payment due, Addicks eventually sued the developer in Texas state court under theories of breach of contract, quantum meruit, and promissory estoppel.  The developer removed the case to federal court based on diversity jurisdiction, and eventually filed a motion for partial summary judgment on all claims

31

for work performed as of the date of the last executed interim waiver.  The district judge granted

the developer's motion, finding that Addicks had waived and released its claims for work and

costs as of the date of the last executed interim waiver.  On appeal, the Fifth Circuit Court of

Appeals affirmed, finding under Texas law that the unambiguous language of the releases

"released all outstanding claims" as of the date of the releases.  *Id.*  at 297.

The *Addicks* case does not represent controlling law.  Even if it did, however, the

breadth of the waiver in *Addicks* is profoundly greater than the *Partial* Lien Waiver in the

instant case.  Unlike the *Addicks* waiver, the Partial Lien Waiver in the instant case did not

purport to waive and release "any other claim of any kind it may have . . . as of the date of this

Waiver" and made no "representation" that the signee had received "full and complete payment

for all work performed" as of the Waiver's date.  Accordingly, because *Addicks* addresses a

waiver with dissimilar, broader language, and further, addresses them under Texas law, that case

is inapposite.

In sum, the cases Grace proffers do not support its position, and the court FINDS that the

Partial Release of Lien does not bar Reroof's claims in the interpleader action before this court.

### Two Waiver of Lien Documents

As to the two Waiver of Lien documents that Pereyra signed in February of 2010 and in

December of 2011, the evidence reflects that those Waivers, like the waiver signed by Bennett,

were unsupported by consideration.  Although both documents reflect that the waivers are

supported by consideration of $44,572.74, Pereyra testified—and no evidence disputes his

testimony other than the waiver documents themselves—that KDV never received the recited

consideration.  Grace does not provide evidence that the consideration was paid but merely

argues that the plain language of the Waiver of Lien states that payment occurred.

The United States Supreme Court has acknowledged "that parol evidence is admissible ... to show that a written contract was without consideration. . . ." *Jones v. New York Guar. & Indem. Co.,* 101 U.S. 622, 631 (1879).  Under Florida law, "failure of consideration is the neglect, refusal, or failure of one of the parties to perform or furnish the consideration agreed upon." *Wallace v. Ralph Pillow Motors, Inc.,* 344 So. 2d 949 (Fla. App. 1977). A release is generally unenforceable when it is not in fact supported by consideration as stated in the release. *See, e.g., Scherer v. Kamelhair,* 665 So. 2d 1147, 1148 (Fla. App. 1996) (reversing a partial summary judgment on a written release  because "there are still issues of material fact concerning whether there was both a lack of consideration and a failure of consideration for the release"); *see also  Broide v. Alvarez*, 90 So. 3d 857 (Fla. App. 2012) (per curiam) (finding that an Operational Agreement is unenforceable "because that agreement was the sole consideration for the Note, [and] the Note is unenforceable for lack of consideration) (citing § 673.3031(2), Fla. Stat. (2004) providing "The drawer or maker of an instrument has a defense if the instrument is issued without consideration.")).

In the instant case, then, Reroof may provide evidence that the consideration recited in the two Waiver of Lien documents was not in fact paid to KDV, and it has indeed provided such evidence, which Grace disputes with no evidence other than the language of the Waiver of Lien documents.   Accordingly, the court FINDS that, to the extent Grace's motion for summary judgment is based on the argument that the two Waiver of Lien documents signed by Pereyra release and bar the claims of KDV/Reroof to the interpled funds, the motion is due to be DENIED.

33

**V.  CONCLUSION**

For the reasons stated, the court FINDS that Grace's motion for summary judgment is due to be DENIED in its entirety; Bennett Lumber and Reroof may pursue their claims in this lawsuit. The court will enter an Order consistent with this Memorandum Opinion.

Dated this 27th day of March, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE